04-22646.rr

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-22646 CIV-UNGARO-BENAGES

NATURAL ANSWERS, INC., a
Florida corporation, et al.,

    Plaintiffs,

vs.

SMITHKLINE BEECHAM CORP.,
a Pennsylvania corporation, d/b/a
GLAXOSMITHKLINE, f/k/a BEECHAM
HOLDINGS, INC., et al.,

    Defendants.
_____/



## REPORT AND RECOMMENDATION

This cause is before the Court on the Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, Granting Mandatory, and Prohibitory Relief, filed October 20, 2004. The Court has reviewed the Motion, the Response, and all other pertinent portions of the file. In addition, an evidentiary hearing was held on the Plaintiff's motion on December 13 and January 12, 2004. The Court adopts the transcript of the hearing by reference herein.

In this Renewed Motion, Plaintiffs Natural Answers, Inc. ("NAI") and its owner Brian A. Feinstein ("Feinstein") seek a temporary restraining order or preliminary injunction which enjoins Defendants (collectively referred to as "GSK") from manufacturing, distributing, promoting, advertising, and offering for sale "Commit Lozenge," an anti-smoking lozenge, and from using any words in advertisements "that resemble those of NAI, including the use of 'the first and only stop smoking lozenge' phrase."

1



## FACTS

Plaintiff Feinstein testified that he came up with the idea of using an herbal formula for the purpose of dealing with smoking by packaging an herbal formulation in lozenges contained in what looks like a cigarette pack. In the summer of 1999 he began marketing this product, called "HerbaQuit," through NAI, which owned the intellectual property rights in the product. NAI as a start-up company filed a trademark application and received a Notice of Allowance. According to Feinstein, the application was listed as abandoned with the USPTO because his attorney did not file the required Statement of Use for the product.

HerbaQuit was introduced into the market in the summer of 1999 in drug stores, supermarkets and convenience stores, and there were also internet sales. In late 1999, Feinstein and NAI entered into a venture capital agreement with Melvin Estrin, the CEO of PharMor drug stores. According to Feinstein, NAI spent approximately $11,500 - 14,500 for advertising HerbaQuit in various trade magazines, and it also had some radio spots. Feinstein estimated sales as in excess of $50,000 but less than $100,000 up until early 2002, when marketing ceased, due to problems with lack of funding.[1] Feinstein testified that he then attempted to develop other business associations, and that Phillip Morris has requested information as to whether NAI has the right to license HerbaQuit. Nothing additional has happened with this opportunity, according to Feinstein, because of this lawsuit.

Feinstein further testified that in early 2002, he was introduced to Pat Friel, an employee of GSK, who worked directly under Dr. Catherine Sohn, who was in the smoking cessation division.

---

[1] Defendants have presented Nielsen data which states that the total reported retail sales in measured outlets for all varieties of HerbaQuit lozenges was $7,748 in 2000, $3,847 in 2001, and $107 in 2002.

In an effort to enter into a joint venture arrangement with GSK, Feinstein sent a proposal by NAI for a marketing strategy to Ms. Friel, which she in turn forwarded to Dr. Rick Chan. Dr. Chan responded by letter, stating that GSK was "most interested in [NAI's] unique packaging regime" and to send any clinical studies that had been done. Feinstein testified that he responded by telling GSK that he did not want it to evaluate the herbal product that he was marketing, but rather, that the proposal was that GSK could put its Nicorette gum NAI's packaging. GSK responded that it was not interested in the packaging format. This correspondence occurred during March and April, 2002.

On October 31, 2002 GSK issued a press release announcing the "Commit Lozenge," ("Commit") which GSK advertised to be "the first and only stop smoking lozenge." GSK Vice-President Steven Burton testified that GSK had begun working to develop a stop-smoking lozenge in 1996. It obtained the license for a nicotine lozenge in 1998 from a company called Theratech, and then began clinical studies. GSK filed a New Drug Application in December 2000 and a trademark application for Commit in August of 2001. The FDA approved Commit on October 31, 2002, prompting the press release.

## DISCUSSION

In order to be entitled to injunctive relief, the moving party must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that the threatened injury to Plaintiff outweighs the harm an injunction may cause the defendant; and (4) that the injunction would not disserve the public interest. See e.g. American Red Cross v. Palm Beach Blood Bank, Inc., 143 F. 3d 1407 (11th Cir. 1998); Tally-Ho v. Coast Community College District, 889 F. 2d 1018 (11th Cir. 1989). A preliminary injunction is an extraordinary remedy that should only be granted when the movant has made a clear showing of its burden of proof. Café 207 v. St. Johns County, 989 F.2d 1136, 1137 (11th Cir. 1993). Furthermore,

when a plaintiff seeks to modify the status quo, as opposed to maintain it, courts have required the plaintiff to make "a stronger showing of likelihood of success." See Cupolo v. Bay Area Rapid Transit, 5 F. Supp. 2d 1078, 1085 (N.D. Cal. 1997).

### Likelihood of Success on the Merits

Plaintiffs' complaint alleges the following Counts: (I) Federal Trademark Infringement; (II) Trademark Infringement Based on Reverse Confusion; (III) Federal Unfair Competition; (IV) False Advertising; (V) Civil Theft of Trade Secret; (VI) Trademark Disparagement; (VII) Attempted and Actual Monopolization; (VIII) Common Law Unfair Competition; (IX) Common Law Trademark Infringement; and (X) Violation of Florida Deceptive and Unfair Trade Practices Act. In an Order dated February 4, 2005, the Honorable Ursula Ungaro-Benages dismissed Counts V and VII.[2]

(1) Count I - Trademark Infringement

To establish a claim for trademark infringement, Plaintiffs must establish ownership of the mark and a likelihood of confusion between the mark and the alleged infringer's mark. Conagra, Inc. v. Singleton, 743 F.2d 1508, 1512 (11th Cir. 1984). Assuming Plaintiffs have demonstrated ownership of the mark, the Court finds that Plaintiffs have failed to demonstrate a likelihood of success in proving a likelihood of confusion, which is analyzed using the following five factors: (1) the type or strength of the mark; (2) the similarity between the Plaintiff's and the Defendant's marks; (3) the similarity between the plaintiff's and defendant's products; (4) the similarity of the parties' retail outlets and sales channels; (5) the similarity of advertising; (6) the defendant's intent; and (7) actual confusion. Ross Bicycles, Inc. v. Cycles USA, Inc., 765 F.2d 1502, 1506 (11th Cir. 1985).

Plaintiffs argue that name "HerbaQuit" is "suggestive" and therefore is inherently distinctive.

---

[2]In that Order, Judge Ungaro-Benages additionally set forth the case law concerning the elements for the various causes of action, which this Court adopts herein.

4

The distinctiveness of a mark refers to how easily customers identify the mark with the represented services. Coach House Rest., Inc. v. Coach and Six Rests., Inc., 934 F.2d 1551, 1559 (11th Cir. 1991). Even assuming for purposes of this motion that Plaintiffs' mark can be considered distinctive, Plaintiffs' evidence falls short on the other requisite elements.

Plaintiffs have made no showing of actual confusion, in that the two products were never in the market at the same time. The Court agrees with Defendants that although there is some similarity between the Plaintiffs' and the Defendants' products, the Plaintiffs' and Defendants' marks are not "similar," other than the fact that both contain the sound "it," which is insufficient. Although both products come in boxes, the Court finds that the boxes are also not so "similar" such as to cause customer confusion.

Although there was some similarity in retail channels, distribution of HerbaQuit, due to its relatively short appearance on the market (approximately two and half years) was certainly much more limited than that of Commit. Although Feinstein testified as to sales somewhere between $50,000 and $100,000, Defendants have presented Nielsen data which states that the total reported retail sales in measured outlets for all varieties of HerbaQuit lozenges was $7,748 in 2000, $3,847 in 2001, and $107 in 2002. Similarly, advertising of the HerbaQuit was much more limited.

Finally, Plaintiffs have made no showing that GSK "intended to adopt a similar name leading to confusion." In fact, the evidence was quite the opposite. GSK offered evidence that in 1995 and 1996, long before HerbaQuit came onto the market and contact was made with Feinstein/NAI, GSK had filed trademarks for the names "Committed Quitters" and "Commit to Quit," respectively.[3] Even

---

[3] Plaintiffs make much of the fact that GSK marketed the Commit Lozenge outside of the U.S. as "Nicobate." However, Steven Burton, a GSK vice-president, testified that GSK did not use that name in the United States because its partner, Pfizer, objected due to similarity with the name of one of its products.

assuming the name was "similar"( which the Court does not find), there is no evidence that there was any benefit to be derived from Plaintiffs' mark, such that GSK would have any intent to cause customer confusion.[4]

Based on a consideration of all of the relevant factors, the Court finds that Plaintiffs have failed to show a likelihood of success as to a claim of trademark infringement.[5]

(2) Count II (Trademark Infringement Based on Reverse Confusion)

In order to prove this count, Plaintiffs must prove that the alleged infringer's use of the original user's mark is so substantial that it causes consumer confusion to the point that the market does not know who created the original mark. Immuno Vital, Inc. v. Golden Sun, Inc., 49 F. Supp. 2d 1344 (S.D. Fla. 1997). As explained above, because there is no showing that the products were marketed at the same time, Plaintiffs have failed to show a likelihood of success on the issue of consumer confusion.

(3) Count IV (False Advertising)

In order to establish a claim for false advertising, Plaintiffs must allege facts showing:

> (1) the ads of the opposing party were false or misleading; (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions,(4) the misrepresented product or service affects interstate commerce, and (5) the movant has been – or is likely to be – injured as a result of the false advertising.

Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1247 (11th Cir. 2002).

GSK argues that Plaintiffs cannot show that their ads claiming that Commit is "the first and

---

[4] Although proof of actual evidence of confusion is not necessary to prove Plaintiffs' claim, the Court notes that there is none, again due to the fact that HerbaQuit and Commit were not being marketed at the same time.

[5] Because they are based on the same elements, the Court finds that Plaintiffs have also failed to show a likelihood of success on the merits on Count III, (Federal Unfair Competition), Count VIII (Common Law Unfair Competition) and Count IX (Common Law Trademark Infringement).

only stop smoking lozenge" are false, because Plaintiffs' HerbaQuit lozenge was not authorized to have been marketed as a "stop smoking lozenge" due to their failure to comply with FDA regulations relating to smoking cessation products. See 21 C.F.R. §310.544(a). Even assuming that Plaintiffs were not required to comply with FDA regulations, and that GSK's ads were "false" or "misleading," Plaintiffs have failed to show a likelihood of success on two of the other required elements - that the deception had a material effect on purchasing decisions, and that Plaintiffs have been - or are likely to be - injured as a result of the advertising.

Fatal to Plaintiffs claim is the fact that the their product was not being marketed at the same time as Commit, which precludes a showing of customer confusion. Moreover, Plaintiffs have failed to provide any clear proof of damages. Plaintiffs have merely presented vague, speculative testimony by Plaintiff Feinstein regarding some possible "deal" with Phillip Morris, as to which there was no corroborating evidence whatsoever. Plaintiffs cannot "create" their own damages in this manner. Accordingly, the Court finds that Plaintiffs have failed to show a substantial likelihood of success as to their claim of False Advertising.[6]

(4) Count VI - Trademark Disparagement

In the Order on the Motion to Dismiss, Judge Ungaro-Benages adopted the following elements for a cause of action for trademark disparagement: (1) a false statement; (2) malice; and (3) adverse economic damages. See Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., 561 F.2d 1365 (10th Cir. 1977). Judge Ungaro-Benages further found that Plaintiffs could satisfy the malice prong by proving GSK's knowledge that NAI marketed and sold HerbaQuit as a smoking cessation product well before GSK introduced Commit into the market, combined with NAI's "repeated

---

[6]Because Count X ( Florida Deceptive and Unfair Trade Practices Act) is based upon a violation of either trademark infringement or false advertising, this Count also fails.

7

requests for GSK to cease advertising Commit as 'the first and only stop smoking lozenge'." However, even assuming this, and that the statement was actually "false," there is still a lack of proof of adverse economic damages, as discussed above. Accordingly, Plaintiffs have also failed to show likelihood of success on the merits as to this claim.[7]

## Recommendation

Accordingly, it is respectfully recommended that the Motion for Temporary Restraining Order and Preliminary Injunction, Granting Mandatory, and Prohibitory Relief be **DENIED**

The parties have ten (10) days from the date of this Report and Recommendation within which to serve and file written objections, if any, with the Honorable Ursula Ungaro-Benages, United States District Judge for the Southern District of Florida. **As the Motion addressed in this Report and Recommendation requests emergency relief, should any party file an Objection within five (5) days of the date of this Report and Recommendation, said Objection shall be faxed or hand-delivered to the opposing party, and that party shall have five (5) days in which to file and serve its response.** Failure to file objections timely shall bar the parties from attacking on appeal the factual findings contained herein. LoConte v. Dugger, 847 F.2d 745 (11th Cir. 1988), cert.

---

[7]Because the Court finds that Plaintiffs have failed to show a substantial likelihood of success on the merits, the Court need not address the remaining requirements for the granting of injunctive relief. The Court notes, however, that it finds that Plaintiffs have also failed to satisfy those elements. Plaintiff's delay in seeking an injunction goes against a finding of irreparable harm. See, e.g., Kaisha v. Swiss Watch International, Inc., 188 F. Supp. 2d 1350, 1155-56 (S.D. Fla. 2002) (stating that "a plaintiff's delay in seeking an injunction in a trademark case 'tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement." (quoting Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985)). As to balance of harm, Mr. Burton testified as to the great expenditure of resources and the logistical problems involved in removing Commit from the shelves of approximately 50,000 retail outlets. On the other hand, Plaintiffs have fallen far short of making any showing of irreparable harm to themselves should an injunction not issue, short of the alleged loss of the vague and speculative "deal" with Phillip Morris, which the Court finds to be totally inadequate.

denied, 488 U.S. 958 (1988).

**DONE AND ORDERED** this 16th day of February, 2005 at Miami, Florida.

                                              STEPHEN T. BROWN
                                              U.S. MAGISTRATE JUDGE

cc:    Honorable Ursula Ungaro-Benages
        Guy B. Bailey, Esq.
        Bruce S. Meyer, Esq.
        Edward Soto, Esq.